# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** )<br>*ex rel* **MEGAN GILBERT,** )<br> )<br> **Plaintiff,** )<br> )<br>**v.** )<br> )<br> )<br>**VIRGINIA COLLEGE, LLC,** )<br> )<br> **Defendant.** ) | Civil Action Number<br>**2:15-cv-336-AKK** |

## MEMORANDUM OPINION AND ORDER

Megan Gilbert filed this *qui tam* action under the False Claims Act against Virginia College, LLC alleging that, in order to maintain eligibility for receiving federal funds, the College falsified its reports, including attendance and grade records. After the Government declined to intervene, doc. 17, and the court unsealed the complaint, doc. 18, the College moved to dismiss, doc. 24. In its motion, as to Counts I and II, which allege violations of 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B), respectively, the College argues that Gilbert's claims are barred by the "public disclosure bar" and res judicata and that the complaint fails to state a claim upon which relief can be granted. *Id.* The motion is fully briefed, *see* docs. 24, 25, & 28, and ripe for adjudication. After reading the briefs, reviewing the

case law, and with the benefit of oral argument, except for the retaliation claims (Counts III and IV), the court concludes that the motion is due to be granted.

## I.  LEGAL STANDARD FOR A MOTION TO DISMISS

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The allegations "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.*

A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  The complaint must establish "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  Ultimately, this inquiry is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id*. at 679.

## II.  FACTUAL BACKGROUND

Virginia College is a for-profit, post-secondary school headquartered in Birmingham, Alabama with over two dozen campuses in eleven states, including four in Alabama.  Docs. 1 at 3; 24 at 2.  Gilbert worked as an adjunct cosmetology

instructor at the Birmingham campus from February 2013 to June 2014 and filed this lawsuit after she purportedly discovered that the College falsified certain reports in order to continue receiving Title IV funding.[1]  Docs. 1 at 3; 24 at 2.

Allegedly, to avoid a domino effect whereby the students who "fail to make satisfactory academic progress" lose their eligibility for Title IV funds and withdraw from school, "negatively affect[ing] [the College's] student retention rate" and jeopardizing its accreditation, the College inflated its students' attendance records and grades.  Doc. 1 at 7-8.  As part of this alleged scheme, the director of the cosmetology program told Gilbert to "mark students as present for an entire class even if they were late to class or left class early," a practice that resulted in the College purportedly giving credit to several students for classes that they missed and never made up.  *Id.* at 8-10.

The College also allegedly engaged in widespread grade manipulation.  *Id.* at 12.  For example, "one student [who] failed 13 tests and had very poor attendance," "nonetheless received a B in the class," despite Gilbert entering a failing grade for the student.  *Id.*  Gilbert also alleges that although she caught a student cheating, the president of the Birmingham campus instructed her "to

---

[1] As part of an effort to expand opportunities to more students, the federal government provides financial assistance under Title IV of the Higher Education Act to "institutions of higher learning," provided that they meet certain conditions.  *See* 20 U.S.C. § 1070.

disregard the cheating and grade the student's assignment as if the student had not cheated." *Id*.

Finally, Gilbert alleges that, in order to receive Pell Grants and Title IV funds, the College used these inflated grades and attendance records in its reports to its accreditation agency, the state licensing board, and the federal government.[2] *Id.* at 13-16. She also alleges that, during a visit by one of the accreditation agency staff members, the director of the cosmetology program presented "a binder that represented that the cosmetology department had conducted several field trips and other activities that had never actually occurred," as well as "future activities that were never actually organized." *Id*.

## III. ANALYSIS

Relevant here, in Counts I and II, Gilbert pleads violations of 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B). The College offers three arguments in support of its motion to dismiss these claims. For purposes of this opinion, the court focuses only on the first—i.e., that the public disclosure bar of § 3730(e)(4)(A) requires

---

[2] Gilbert also alleges that the College violated the FCA by providing "incentive compensation" to its recruiters. However, this allegation consists merely of a barebones, conclusory statement that, at some point before she began working at the College, a recruiter received compensation based on the number of students he enrolled. Doc. 1 at 13. Because Gilbert does not explain with any "particularity" the circumstances of the alleged compensation scheme, or how she knows that the recruiter in question received such compensation, the court holds that Gilbert's incentive compensation claim lacks the "indicia of reliability" necessary to satisfy Rule 9(b). *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005).

dismissal and that Gilbert does not qualify for the provision's "original source" exception.[3]

The False Claims Act was "enacted in 1863 with the principal goal of 'stopping the massive frauds perpetrated by large [private] contractors during the Civil War.'" *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 781 (2000) (quoting *United States v. Bornstein*, 423 U.S. 303, 309 (1976)). Originally, the FCA required no firsthand knowledge of false claims, resulting in "some enterprising individuals fil[ing] FCA actions based not on their own independent knowledge of a fraud but on information revealed in the government's criminal indictments." *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 297-98 (3d Cir. 2016). In response, Congress created a jurisdictional bar to any FCA suit that was "based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought." 31 U.S.C. § 232(C) (1946).

Congress again amended the FCA in 1986, realizing that barring any suit based on information that the government is aware of "did not just eradicate the parasitic lawsuits," but in fact "eliminated most FCA lawsuits, for courts strictly interpreted § 232(C) as barring FCA actions even when the government knew of

---

[3] The court does not reach the other two arguments—that Gilbert's claims are barred by res judicata, and that the complaint fails to state a claim upon which relief can be granted— because it finds that dismissal is warranted under the public disclosure bar.

the fraud only because the relator had reported it." *Majestic Blue Fisheries*, 812 F.3d at 297-98. The 1986 amendments "replac[ed] the government knowledge defense with the less restrictive public disclosure bar," which "precluded a relator from bringing an action that was based on allegations or transactions of fraud that had been publicly disclosed in certain enumerated sources, but included an exception where the relator was an 'original source' of the information underlying the action." *Id.* (quoting 31 U.S.C. § 3730(e)(4)(A) (2006)). The 1986 version read as follows:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in
>
> (i)    a criminal, civil, or administrative hearing,
> (ii)   in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or
> (iii)  from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (2006). The 1986 version of the public disclosure bar was jurisdictional, so courts were obligated to dismiss a case when it applied. *See, e.g., Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 564 (11th Cir. 1994).

But the 1986 version of the public disclosure bar proved too restrictive still. So, in 2010, Congress again amended the FCA, in part, to read:

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or

transactions as alleged in the action or claim were publicly
disclosed—

(i)     in a Federal criminal, civil, or administrative hearing in which
        the Government or its agent is a party;
(ii)    in a congressional, Government Accountability Office, or other
        Federal report, hearing, audit or investigation; or
(iii)   from the news media, unless the action is brought by the
        Attorney General or the person bringing the action is an
        original source of the information.

31 U.S.C. § 3730(e)(4)(A) (2012).

The 2010 amendment changed the nature of the public disclosure bar in
several important ways. First, the bar is no longer jurisdictional, but rather an
affirmative defense. *United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805,
810 (11th Cir. 2015) ("[T]he amended § 3730(e)(4) creates grounds for dismissal
for failure to state a claim rather than for lack of jurisdiction."). Second, Congress
limited the scope of allegations that will trigger the provision. Whereas the pre-
2010 language included any claim "based upon" certain enumerated disclosures,
the new language bars only complaints that contain "substantially the same
allegations or transactions as alleged in the action or claim were publicly
disclosed." *Compare* 31 U.S.C. § 3730(e)(4)(A) (2006) *with* 31 U.S.C. §
3730(e)(4)(A) (2012). Finally, Congress amended the enumerated categories of
disclosure. Unlike the 1986 version, which included any allegations made public
in "a criminal, civil, or administrative hearing," the new set of enumerated
disclosure categories is more restrictive, as it includes only information disclosed

in "a *Federal* criminal, civil, or administrative hearing *in which the Government or its agent is a party*." *Id.* (emphasis added). Thus, while information obtained from a hearing in a state court may have barred an action under the old version of the rule, in the current version only federal proceedings qualify as public disclosures, and only if the "Government or its agent" is a "party" to the action. *Id.*

With this background in mind, the court turns now to the specific contentions in this case. The College argues that the public disclosure bar applies because (1) another plaintiff publicly disclosed "substantially the same" allegations in a previous *qui tam* suit; (2) the "Government or its agent" was a party to that suit because, although the Government declined to intervene, the United States is always the "real party in interest" in *qui tam* actions, and relators are "agents" of the Government; and (3) Gilbert does not qualify for the "original source" exception because her allegations do not "materially add" to the other complaint and she lacks "independent" knowledge of the wrongdoing. Doc. 24 at 3-5. The court addresses these arguments below.

## A. Whether Gilbert's allegations are "substantially the same"?

The complaint that the College cites for the application of the public disclosure bar, *U.S. ex rel. Smith v. Virginia Coll., LLC*, No. 2:13-CV-00547 (M.D.

Ala. July 31, 2013),[4] was unsealed in mid 2014, well before Gilbert filed this lawsuit. *See Smith*, No. 2:13-CV-00547, doc. 11. To support its contention that Gilbert raises "substantially the same" allegations as those alleged in the *Smith* complaint, the College cites the Eleventh Circuit's decision in *United States ex rel. Osheroff v. Humana Inc.*. Doc. 24 at 3. Briefly, the relator in *Humana* claimed that insurers and health clinics receiving federal funds violated the FCA by offering services such as transportation, free meals, spa services, and entertainment, without regard for medical purpose or financial need. 776 F.3d at 808-13. The defendant raised the public disclosure bar, citing news reports, newspaper advertisements, and the clinics' websites as sources of prior disclosure. *Id.* at 808-13. The court agreed, holding that the relator's post-2010 allegations were substantially the same as those publicly disclosed because of the "significant overlap" between them: the relator's "essential allegation [was] that the clinics provided a wealth of free services," and "[t]he public sources fully disclose[d] that the defendant clinics provided such services, including transportation, meals, entertainment, and spa services, at no cost." *Id.* at 814.

---

[4] The College also cites another previous complaint that asserted violations based on incentive compensation for recruiters. Doc. 24 at 4 (citing *U.S. ex rel. Sailes v. Educ. Corp. of Am.*, No. 2:12-CV-00807 (M.D. Ala. Sept. 17, 2012)). Because the court finds that Gilbert has not sufficiently pleaded the incentive compensation violations, *see* n.2 *supra*, the court considers only the *Smith* complaint in this opinion. However, this claim would also likely fail for the same reasons articulated herein.

Other courts have provided additional guidance on the issue. For example, the First Circuit held that the substantial sameness test bars "a complaint that targets a scheme previously revealed through public disclosures . . . even if it offers greater detail about the underlying conduct." *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 210 (1st Cir. 2016). And the Seventh Circuit uses several factors to determine substantial sameness, asking whether the complaint 1) presents genuinely new and material information beyond what has been publicly disclosed; 2) alleges a different kind of deceit; 3) requires independent investigation and analysis to reveal any fraudulent behavior; 4) involves an entirely different time period than the publicly disclosed allegations; and 5) supplies vital facts not in the public domain. *Bellevue v. Universal Health Servs. of Hartgrove, Inc.*, 867 F.3d 712, 718-19 (7th Cir. 2017).

To no surprise, Gilbert argues that her allegations are not "substantially the same" as those pleaded in *Smith*, contending that she alleges wrongdoing during a different time period and at a different campus. Doc. 25 at 5. More specifically, as to the first alleged distinction, Gilbert contends that "[s]he alleges alteration of grade and attendance records from 2013 to 2014," while "the relators in *Smith* described wrongdoing occurring through mid-2013." *Id.* The court is not convinced because the time period alleged here is virtually the same as that of the *Smith* complaint, not an "entirely different time period." *See Bellevue*, 867 F.3d at

718-19.  Likewise, as to Gilbert's second alleged distinction, despite the geographic differences, the pleadings here show a "significant overlap" with the allegations in the *Smith* case.  *See Humana*, 776 F.3d at 814.  Therefore, the court holds that the allegations in Gilbert's complaint are "substantially the same" as those in *Smith*.

### B. Whether the United States is always a "party" to a *qui tam* suit?

In addition to showing the existence of a prior public disclosure of "substantially the same" allegations to invoke the public disclosure bar, the College must also show that the disclosure occurred in a federal proceeding in which "the Government or its agent is a party."  *See* § 3730(e)(4)(A)(i).  The parties disagree on whether the Government must actually intervene for a finding of party status and whether the relator is in fact an "agent" of the Government under § 3730(e)(4)(A)(i), even without intervention.  Docs. 28 at 3-4; 25 at 3-4.  The College also argues that the Government was a "party" to the *Smith* dismissal because the Government is always the true "party in interest" in *qui tam* litigation, and thus contends that the court can decide this issue without consideration of the secondary issue of whether the *Smith* relator was an "agent" of the Government.  Doc. 28 at 4-6.

The FCA does not define the terms "party" or "agent," *see* § 3701, and the Eleventh Circuit has not had the opportunity to address either issue for purposes of

the FCA's public disclosure bar. Indeed, whether a *qui tam* relator is an "agent" of the Government for purposes of the public disclosure bar appears to be an issue of first impression in the federal courts, though courts have assumed that relators are agents of the Government in other contexts in light of the accepted fact that the Government is the real party in interest.[5]

Gilbert relies on *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928 (2009), to support her contention that party status requires actual intervention by the Government. *Eisenstein* involved a relator who had lost at trial and filed a notice of appeal 54 days after the trial court entered judgment. The relator argued that, even though the Government did not intervene in his suit, his notice of appeal should be subject to the longer 60-day filing window for governmental parties under the Federal Rules of Appellate Procedure because the United States is always the "real party in interest" in *qui tam* suits. *Id.* at 930-31. The Court rejected this argument, explaining that "[t]he United States . . . is a

---

[5] Although the court is unaware of any other courts that have interpreted the term "agent" in § 3730(e)(4)(A)(i), some courts have declared in dicta that *qui tam* relators are agents of the Government. *See*, *e.g.*, *U.S. ex rel. Hyatt v. Northrop Corp.*, 91 F.3d 1211, 1215 (9th Cir. 1996) ("*Qui tam* plaintiffs are merely agents suing on behalf of the government, which is always the real party in interest."); *U.S. ex rel. Amin v. George Washington Univ.*, 26 F. Supp. 2d 162, 168 n.1 (D.D.C. 1998) (a *qui tam* relator "merely acts as the United States' agent in pursuing the claim"). Indeed, this conclusion is supported by the legislative history of the FCA, which repeatedly uses the word "government" when referring to suits brought in the name of the United States by either the Attorney General or private *qui tam* plaintiffs." *See Hyatt*, 91 F.3d at 1214. The ambiguous usage of "government" is "consistent with the theory [that] *qui tam* plaintiffs are merely" government agents. *Id.* at 1215 (collecting cases).

'party' to a privately filed FCA action only if it intervenes in accordance with the procedures established by federal law." *Id.* at 933. As Justice Thomas explained:

> To hold otherwise would render the intervention provisions of the FCA superfluous, as there would be no reason for the United States to intervene in an action in which it is already a party. . . . Congress expressly gave the United States discretion to intervene in FCA actions—a decision that requires consideration of the costs and benefits of party status. . . . The phrase, "real party in interest," is a term of art utilized in federal law to refer to an actor with a substantive right whose interests may be represented in litigation by another. Congress' choice of the term "party" in Rule 4(a)(1)(B) and § 2107(b), and not the distinctive phrase, "real party in interest," indicates that the 60-day time limit applies only when the United States is an actual "party" in *qui tam* actions—and not when the United States holds the status of "real party in interest." Consequently, when, as here, a real party in interest has declined to bring the action or intervene, there is no basis for deeming it a "party" for purposes of Rule 4(a)(1)(B).

*Id.* at 933-35.

Because *Eisenstein* defines the term "party" as it relates to the United States' party status in a *qui tam* lawsuit, the court is persuaded that the Government was not a "party" to the *Smith* lawsuit. *See id.* Like Rule 4(a)(1)(B) of the Federal Rules of Appellate Procedure and 28 U.S.C § 2107(b), the FCA's public disclosure bar uses the term "party" rather than "real party in interest." 31 U.S.C. § 3730(e)(4)(A)(i). Congress amended the FCA after *Eisenstein*, and Congress is presumed to know the law. *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 697 (1979). Congress was "free to change [the Supreme Court's] interpretation[s] of [the FCA]," *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736 (1977), and could have

used the term "real party in interest." Instead, it deferred to the *Eisenstein* interpretation and kept the term "party." *See Eisenstein*, 556 U.S. at 933-35. Accordingly, unless and until Congress amends the FCA, the Government must intervene to be a "party" to a *qui tam* suit.

The College argues alternatively that the public disclosure bar still applies because a *qui tam* relator is an "agent" of the Government. Doc. 28 at 4 n.3. In support, it relies on *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, which involved a *qui tam* action alleging false claims to the EPA, and argues that a relator is a "statutorily designated agent of the United States." Doc. 28 at 5 n.3. In *Vermont Agency*, the relator argued that, although the Government declined to intervene in his suit, he was "suing to remedy an injury in fact suffered by the United States" and thus had Article III standing on that basis alone. 529 U.S. at 771-72. The Court rejected this argument, explaining that a *qui tam* relator's standing arises, not from an agency relationship, but rather from a partial assignment of the Government's damages claim:

> It would perhaps suffice to say that the relator here is simply the statutorily designated agent of the United States, *in whose name* . . . the suit is brought—and that the relator's bounty is simply the fee he receives *out of the United States' recovery* for filing and/or prosecuting a successful action on behalf of the Government. This analysis is precluded, however, by the fact that the statute gives the relator himself an interest *in the lawsuit,* and not merely the right to retain a fee out of the recovery

*Id.* (emphasis in original). The Court goes on to list many of the ways relators exercise a level of control over *qui tam* litigation that are consistent with standing specific to a party rather than standing based on an agency relationship.[6] Ultimately, the Court concluded that the "United States' injury in fact suffices to confer standing on" a relator because he is the partial "assignee . . . of the Government's damages claim." *Id.* at 773; *see also id.* at 788 (Ginsburg, J., concurring) ("I agree with the Court that the *qui tam* relator is properly regarded as an assignee of a portion of the Government's claim for damages."). In other words, the relator is an assignee suing to address an injury "suffered by the assignor," in this case, the United States. *See id.*

As such, the court finds that the relator is indeed an "agent" of the Government under § 3730(e)(4)(A)(i). This holding is consistent with general agency principles. The word "agent" is a term of art, and "[w]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322 (U.S. 1992) (internal quotations omitted). And the

---

[6] The FCA provides that "a person may bring a civil action for a violation of section 3729 for the person and for the United States Government; gives the relator the right to continue as a party to the action even when the Government itself has assumed primary responsibility for prosecuting it; entitles the relator to a hearing before the Government's voluntary dismissal of the suit; and prohibits the Government from settling the suit over the relator's objection without a judicial determination of fairness, adequacy and reasonableness." *Vermont Agency*, 529 U.S. at 772 (quoting § 3730) (emphasis and internal quotations and citations omitted).

Eleventh Circuit has counseled that, "when applying agency principles to federal statutes, the Restatement of Agency is a useful beginning point." *GDG Acquisitions LLC v. Gov't of Belize*, 849 F.3d 1299, 1308 (11th Cir. 2017) (internal quotations omitted). In that respect, the Restatement of Agency defines agency as "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) Of Agency § 1.01 (2006). The assent here is built in the statutory framework that recognizes that the Government is the real party in interest and that the relator is the assignee of the Government's damages claim. Indeed, even when the Government elects not to intervene, the Government still receives copies of all pleadings and deposition transcripts, can move to stay discovery if it interferes with an ongoing criminal or civil investigation, and has the right to approve or reject a stipulated dismissal. *See* § 3730(b)(1), (c)(2)(D)(3), (c)(4). The Government may even intervene at a later date upon a showing of a good cause, *see* § 3730(c)(2)(D)(3), and subsequently dismiss a case over the relators' objections, *see* § 3730(c)(2)(A). As one court put it, "even in cases where the government does not intervene, there are a number of control mechanisms present in the qui tam provisions of the FCA so that the [Government] nonetheless retains a significant amount of control over the

litigation." *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 753 (5th Cir. 2001). *See also U.S. ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1041 (6th Cir. 1994) ("[T]he Executive Branch retains sufficient control over the relator's conduct to ensure that the President is able to perform his constitutionally assigned duty.") (internal quotations omitted).

Applying these principles here, it is clear that, because the Government is the real party in interest, *qui tam* relators are "agents" of the government. Even when the Government does not intervene, the Government exerts a fair amount of control over *qui tam* litigation, as it has veto power over any settlement and/or dismissal, *see* § 3730(b)(1), and retains at all times the right to dismiss or settle a *qui tam* action. *United States v. Everglades Coll., Inc.*, 855 F.3d 1279, 1286 (11th Cir. 2017). *See* § 3730. The Government certainly relinquishes the right to control most aspects of a *qui* tam suit when it elects not to intervene, including which motions to file, which legal arguments to make, what discovery to seek, or which witnesses to call at trial. But even in such situations, it remains the real party in interest and has certain rights over the litigation, including whether to approve or reject a stipulated dismissal, and ultimately the plaintiff is pursuing the action on the Government's behalf. *See U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 852 (7th Cir. 2009) ("[A]lthough the United States is not a "party" to a *qui tam* suit unless it intervenes, it is nonetheless a real party in interest—which is to

say that its financial interests are at stake. . . . The United States is entitled to at least 70% of any recovery, even when it does not intervene.").

While the court acknowledges that the legislative history undergirding the public disclosure bar is opaque, to say the least, there is no disagreement that the progressively more lenient text of the bar reflects Congress's attempt to locate "the golden mean between adequate incentives for whistle-blowing insiders with genuine valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute on their own." *Graham Cty. Soil & Water Conserv. Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 294 (2010). Nonetheless, to find, as Gilbert argues, that a relator's *qui tam* action could proceed based purely on the fact that the Government declined to intervene in prior litigation alleging substantially the same facts would undermine this careful balance. The need to incentivize whistleblower lawsuits is greatly reduced when the government already knows of, and has had an opportunity to investigate, the alleged violation. If Congress had intended to allow a relator who is not an original source to proceed with a lawsuit alleging substantially the same violations as a previous relator's complaint simply because the Government failed to intervene in the previous lawsuit, it would have said so. Accordingly, the court concludes that *qui tam* relators are "agents" of the Government under the most reasonable reading of § 3730(e)(4)(A)(i), and that the College has satisfied the

second prong of the public disclosure bar by showing that the *Smith* relator acted

as an "agent" of the Government in that litigation.

### C. Whether Gilbert qualifies as an "original source" of the allegations?

Gilbert's suit may still survive if she can show she is an "original source" of

the allegations. "Original source" is defined in the 2010 amendments as an

individual who either:

> (i) prior to a public disclosure under subsection (e)(4)(A), has
> voluntarily disclosed to the Government the information on
> which allegations or transactions in a claim are based, or
> (ii) who has knowledge that is independent of and materially adds
> to the publicly disclosed allegations or transactions, and who
> has voluntarily provided the information to the Government
> before filing an action under this section.

31 U.S.C. § 3730(e)(4)(B) (2012).

This definition makes two important changes from prior versions. First, it

adds a new category of original sources: individuals who disclosed the information

to the government before public disclosure, regardless of their knowledge.

*Compare* 31 U.S.C. § 3730(e)(4)(B) (2006) *with* 31 U.S.C. § 3730(e)(4)(B) (2012).

Second, it expands the scope of "original source" to include individuals with

knowledge "that is independent of and materially adds to the publicly disclosed

allegations or transactions." *Id.* The previous definition of "original source"

required "direct and independent knowledge" of the allegations, which created an

"extreme limit" on any information that was obtained "secondhand," *see United*

*States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 841 F.3d 927, 936 (11th Cir. 2016), but the new definition omits the word "direct." As a result, secondhand knowledge is actionable under the amended FCA. *See Majestic Blue Fisheries*, 812 F.3d at 299 ("[A] relator no longer must possess "direct . . . knowledge" of the fraud to qualify as an original source.).

Turning to the arguments here, the College first contends that Gilbert is not an original source because she "bases her allegations on 'information and belief,'" which apparently "demonstrates that her knowledge is secondhand—not independent." Doc. 24 at 6. But this argument misstates both the facts and the law. Gilbert's pleadings are clear that her knowledge is firsthand, as she alleges that her supervisors changed a failing grade she entered to a "B," and directed her to mark absent students as having attended and to ignore an instance of academic dishonesty. Doc. 1 at 10, 12. Moreover, the FCA no longer requires an original source to have "direct" knowledge of the allegations, and, as such, the College relies on an obsolete legal standard. *See* doc. 24 at 6 (citing *Saldivar*, 841 F.3d at 936-37, which applied the pre-2010 version of the public disclosure bar, *see id.* at n.1). Under the current law, knowledge "that is independent of and materially adds to the publicly disclosed allegations or transactions" will suffice. *See* § 3730(e)(4)(B); *see also Majestic Blue Fisheries*, 812 F.3d at 299 ("The focus now is on what independent knowledge the relator has added to what was publicly

disclosed."). Consequently, because Gilbert learned of the alleged misconduct through her employment, she has independent knowledge of the allegations.

The College next argues that the *Smith* lawsuit, "while ultimately dismissed, asserted FCA violations by Virginia College for the very same reasons [Gilbert] alleges here" and that Gilbert's allegations "therefore do not 'materially add' to what has already been disclosed." Doc. 24 at 6. The Eleventh Circuit has had only a single opportunity to consider the "materially adds to" language in the new original source exception. *See Humana Inc.*, 776 F.3d at 815. The relator in *Humana* argued that he was an "original source" because his complaint included more specific allegations than previous complaints, including "the type of food the clinics served for lunch, the destinations of some of the free transportation, the frequency of salon services, and the price of substitute services or goods." 776 F.3d at 815-16. Allegedly, this information "materially add[ed]" to the existing disclosures because it showed that the services offered "were more than nominal in value." *Id.* The circuit disagreed, holding that, although the complaint "add[ed] background information and details relating to the value of the services offered, making it somewhat more plain" that the clinics were violating the law, it did not "materially add" to the publicly disclosed allegations because "any remuneration or offer of remuneration is illegal," including nominal ones. *Id.*

Here, while Gilbert's complaint certainly provides previously undisclosed "background information and details" about the College's alleged scheme, it does not allege any new or distinct violations. All of Gilbert's allegations—grade inflation, attendance inflation, and falsifying reports to accreditation agencies—are included in the *Smith* complaint. *See U.S. ex rel. Smith v. Virginia Coll., LLC*, No. 2:13-CV-00547 (M.D. Ala. July 31, 2013), doc. 1 at 3-7. In that respect, though Gilbert's alleged knowledge of the wrongdoing is "independent of" the allegations in the *Smith* complaint, her allegations do not "materially add" to those in *Smith*, and she is not an "original source" under § 3730(e)(4)(B).

## CONCLUSION AND ORDER

For the foregoing reasons, the public disclosure bar requires dismissal because "substantially the same allegations . . . were publicly disclosed . . . in a Federal . . . hearing in which the Government or its agent is a party," *see* § 3730(e)(4)(A), and because Gilbert does not fall within the "original source" exception. Therefore, as to Counts I and II, Virginia College's Motion to Dismiss, doc. 24, is **GRANTED**. The motion is **DENIED**, however, with respect to the retaliation claims (Counts III and IV). For the reasons stated in open court, Gilbert has adequately pleaded that she engaged in protected activity—i.e., as to her § 3730(h) claim (Count III) that she confronted administrators regarding their falsification of attendance records, and as to her Title VII claim (Count IV) that she

complained about alleged sexual harassment—and that the College purportedly retaliated against her as a result by denying her severance benefits and a letter of recommendation. *See* doc. 1 at 20-21.

**DONE** the 29th day of March, 2018.

    _____
    **ABDUL K. KALLON**
    UNITED STATES DISTRICT JUDGE